FILED

**United States District Court**
**Northern District of Alabama**
**Southern Division**

02 DEC -5 AM 10: 46
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **Howard Mott,** | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-01-N-3015-S |
| | ] | |
| **CU Leasing, Inc. and Alabama** | ] | |
| **Credit Union League,** | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED
DEC 0 5 2002

**Memorandum of Opinion**

**I.   Introduction.**

This case involves claims arising out of the termination of the plaintiff's employment with the defendants, CU Leasing, Inc. ("CU Leasing"), and Alabama Credit Union League ("the League").[1] Plaintiff Howard Mott ("Mr. Mott") alleges that he was discharged from his employment in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"). Presently before the court is the defendants' motion for summary judgment, filed on August 12, 2002. [Doc. # 24.] The issues have been briefed by both parties and are now ripe for decision. Upon due consideration, the motion will be granted.

---

[1] As is explained *infra*, the corporate structure of the entities involved is fairly complicated. To say that this case involves the termination of the plaintiff's employment with the defendants is a bit of an oversimplification.



II. **Facts.**[2]

A. **Background facts.**

Mr. Mott was employed by an entity called CU Lending, Inc. ("CU Lending"), as a Marketing Representative from May 3, 1999, until May 8, 2001. His primary duties involved the marketing and sale of various products for CU Leasing, a corporation owned in part by ACUL Corp., which in turn is owned by the League. Under a management agreement between CU Lending and CU Leasing, CU Lending provided employees to CU Leasing, and CU Lending was reimbursed by CU Leasing for compensation and benefits paid to those employees. Gary B. Wolter ("Mr. G. B. Wolter") is the President and CEO of the League and its affiliates, including CU Lending and CU Leasing. He was responsible for hiring, setting salaries, and terminating employees. Gary M. Wolter ("Mr. G. M. Wolter") is the manager of CU Lending and CU Leasing and was Mr. Mott's supervisor during his employment. Neal Shaffield ("Mr. Shaffield") was, at all times relevant to this lawsuit, the Executive Vice-President and Special Assistant to the President for Administration for the League.

Mr. Mott's job duties varied during his tenure with CU Lending because the services offered by CU Leasing changed over time. At the time he ended his employment, Mr. Mott marketed GAP insurance policies and automobile warranties to various credit unions that

---

[2] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

were members of the League. The credit unions, in turn, sold these policies to their customers. When he began his employment, Mr. Mott's annual salary was $37,000.08; he received a salary increase on July 7, 2000, at which time his annual salary became $38,664.96. Mr. G. M. Wolter testified that this increase in salary represented more of a "token increase" for cost of living than a merit-based salary increase.

### B. Mr. Mott's medical condition.

Mr. Mott reported for his regular physical examination with his internist prior to March 19, 2001. The internist recommended that Mr. Mott undergo an arteriogram at the University of Alabama at Birmingham hospital, which took place on March 19, 2001. As a result of that test, it was discovered that Mr. Mott required immediate bypass surgery, which was performed on March 20, 2001. As a result of his heart problems, Mr. Mott took a medical leave of absence from work beginning on March 19, 2001.

### C. The financial state of affairs at CU Leasing.

In 1999, CU Leasing realized a $14,772.00 gain from operations; in 2000, it had a loss of $53,485.00; and in the first quarter of 2001, it lost $8,189.43. After the large loss in 2000, discussions about "how to build the company and how to reduce the expenses took place probably as early as January of [2001] – well, probably even maybe before that in December." (G. B. Wolter Dep. at 23.) When the first quarter financial information became available in April 2001, Mr. G. B. Wolter decided to revise Mr. Mott's compensation plan. To that end, he asked Mr. Shaffield to prepare a revised compensation plan for Mr. Mott. The revised plan provided that Mr. Mott would no longer be paid strictly on a salary basis; instead, he would be paid a base salary of $12,000.00, plus commissions derived from the

3

sale of GAP insurance policies and warranty policies. Mr. G. B. Wolter indicated that he wanted to present the revised compensation plan to Mr. Mott on his first day back from his medical leave of absence.

### D. The termination of Mr. Mott's employment at CU Lending.

Mr. Mott returned to work on Monday, May 7, 2001, without first informing anyone at CU Lending or CU Leasing that he planned to return to work on that date. That afternoon, at approximately 4:30 p.m., Mr. Shaffield called Mr. Mott into his office and presented him with the revised compensation plan, which was to become effective on May 16, 2001. Mr. Shaffield explained that Mr. Mott's compensation plan had been revised because of the financial condition of the company. Mr. Shaffield and Mr. Mott had a brief conversation about the revised compensation plan, during which Mr. Mott asked Mr. Shaffield "what if I find this pay plan unacceptable?" (Mott Dep. at 43.) Mr. Shaffield replied, "you better have somewhere to go."[3] (*Id.*) Mr. Shaffield invited Mr. Mott to review the plan overnight and talk with him about it the next day.

Mr. Mott took the revised compensation plan home that evening and studied it. The next morning he went to Mr. Shaffield's office at 8:30 a.m. and told him that he had some questions about the compensation plan, to which Mr. Shaffield responded "that's the way it is." (Mott. Dep. at 43.) Mr. Mott then asked Mr. Shaffield whether he was being fired. Mr. Shaffield responded by asking Mr. Mott if he wanted to tender a letter of resignation. Mr. Shaffield indicated that if Mr. Mott tendered a letter of resignation, Mr. Shaffield could try

---

[3] Mr. Shaffield does not recall making that statement. He remembers responding to Mr. Mott's question by stating that "this is the pay plan for this job." (Shaffield Dep. at 90.) Furthermore, Mr. Shaffield remembers this exchange occurring on May 8, 2001, rather than May 7.

to ensure that Mr. Mott received severance pay. Mr. Mott "felt like at that point that [he] was being fired because [he] did not agree with the pay plan." (*Id.*) Mr. Mott turned in his company credit card and telephone and his key to the building and left.[4]

Mr. Mott received his usual salary for the dates May 7, 2001, through May 15, 2001, although he did not work on those dates.[5] Mr. Mott admits that if he had agreed to the revised compensation plan, he "probably could have gone back to work." (Mott Dep. at 45.) The undisputed evidence shows that Mr. Mott could have earned more money under the revised compensation plan than he was earning previously. Since he left CU Lending, no one has been hired to replace Mr. Mott; Mr. G. M. Wolter has taken over Mr. Mott's sales duties. Indeed, Mr. G. M. Wolter was the only employee of CU Leasing at the time of his deposition. Mr. Mott contends that his employers "considered [him] disabled, and the new pay plan was constructed to try to force [him] to leave." (Mott Dep. at 48.) At the time of his deposition, Mr. Mott was employed by HomeSouth Mortgage as a loan originator, and he was being paid on a strictly commission basis.

---

[4] The details as to this meeting between Mr. Shaffield and Mr. Mott are also in dispute. Mr. Shaffield testified in his deposition that Mr. Mott "said he didn't like the plan" and "noted he felt it was a ploy to get rid of him." (Shaffield Dep. at 92.) Mr. Shaffield claims that Mr. Mott said "let me make this easy for everyone," turned in his credit card, phone, and supplies, and left. (Shaffield Dep. at 93.) Mr. Shaffield does not recall Mr. Mott asking whether he was being terminated, nor does he recall mentioning severance pay. Indeed, Mr. Shaffield took issue with the use of the phrase "severance pay" to describe Mr. Mott's receipt of a paycheck for the week following his last day of work. (Shaffield Dep. at 112.) Mr. Shaffield claims that he asked Mr. Mott if he was resigning only as Mr. Mott was leaving his office.

[5] Although Mr. Mott characterizes this payment as "severance pay," there is no evidentiary support for labeling it as such. *See supra* note 3.

### III.     Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

**IV.     Discussion.**

Mr. Mott claims he was wrongfully terminated in violation of the ADA, which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the . . . discharge of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail under the ADA, Mr. Mott must prove a *prima facie* case of disability discrimination by showing: (1) he has a disability, as that term is defined under the ADA; (2) he is qualified to serve in his former position at CU Lending, either with or without some reasonable accommodation, despite his disability; and (3) he has suffered an adverse employment action because of his disability. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998); *Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1300-01 (M.D. Ala. 2001); *Gable v. USS*, No. CV96-S-666-S, 1997 U.S. Dist. Lexis 23897, at *9-10 (N.D. Ala. Apr. 28, 1997). In the absence of direct evidence, Mr. Mott can establish the third element of his *prima facie* case by showing that (1) he was terminated from his position; and (2) the position remained open and was ultimately filled by a person without a disability as that term is defined in the ADA. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) (Title VII case); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) ("[A] plaintiff may establish a *prima facie* case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases."). If Mr. Mott succeeds in establishing his *prima facie* case of discrimination, the defendants must articulate a legitimate, non-discriminatory reason for terminating Mr. Mott. *Wascura*, 257 F.3d at 1242. Once the defendants articulate such a

reason, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reason[ ] given by the employer [was] not the real reason[ ] for the adverse employment decision,'" but is mere pretext for unlawful discrimination. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

**A.    *Prima facie* case.**

    **1.    Was Mr. Mott disabled within the meaning of the ADA?**

Mr. Mott must first establish that he suffered from a disability within the meaning of the ADA. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Mr. Mott seeks to establish his ADA claim under only the third definition of disability; he claims the defendants regarded him as being disabled as a result of the heart problems he experienced in March 2001. Mr. Mott can prove that he was regarded as being disabled by showing that the defendants mistakenly believed either that he had a physical impairment that substantially limited one or more major life activities or that an actual, nonlimiting impairment substantially limited one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In either scenario, "it is necessary that [the defendants] entertain[ed] misperceptions about the individual . . . . These misperceptions often 'result from stereotypic assumptions not truly indicative of . . . individual ability.'" *Sutton*, 527 U.S. at 489 (quoting 42 U.S.C. § 12101(7)).

Mr. Mott alleges the defendants regarded his nonlimiting heart condition as an impairment that substantially limited him in the major life activity of working. To succeed on this theory, Mr. Mott must establish that the defendants believed Mr. Mott's impairment "generally foreclos[ed] the type of employment involved, not just a narrow range of job tasks." *Gordon v. E. L. Hamm & Assocs., Inc.*, 100 F.3d 907, 913 (11th Cir. 1996). *See also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) ("When individuals claim that they are [regarded as] substantially limited in the major life activity of 'working,' their condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'") (citation omitted).

The sum total of Mr. Mott's evidence to support his contention that the defendants viewed him as being substantially limited in his ability to work is Mr. Mott's uncorroborated suspicion, based on the fact that he was presented with his revised pay plan on the day he returned from medical leave, that he was perceived by his employer as disabled. This evidence falls well short of the sort of evidence required to support a finding that the defendants regarded Mr. Mott as being substantially limited in his ability to work. *See, e.g., Sutton*, 527 U.S. at 467 ("Standing alone, the allegation that [the defendant] has a vision requirement in place does not establish a claim that [the defendant] regards [the plaintiffs] as substantially limited in the major life activity of working."); *Murphy v. United Parcel Serv.*, 527 U.S. 516, 524 (1999) ("The evidence that [the plaintiff] is regarded as unable to [perform one specific job] is not sufficient to create a genuine issue of material fact as to whether [he] is regarded as unable to perform a class of jobs utilizing his skills. . . . Indeed,

9

it is undisputed that [the plaintiff] is generally employable as a mechanic [as] he secured another job as a mechanic shortly after leaving [his employment with the defendant.]"); *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999) ("The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled. An employee who is perceived by his employer as having only a temporary incapacity to perform the essential functions of his job is not perceived as 'disabled' as defined by the [ADA]."); *Bray v. Nat'l Servs. Indus., Inc.*, 209 F. Supp. 2d 1343, 1351 (M.D. Ga. 2001) ("Without evidence that Defendant considered her injuries to be anything more than temporary, Plaintiff has provided no adequate basis for claiming that she was regarded as having a disability."). The court is of the opinion that Mr. Mott has not adduced evidence sufficient to allow a reasonable jury to conclude that he was regarded by his employer as having an impairment that substantially limited his ability to work. As such, he is unable to establish a *prima facie* case of discrimination, and summary judgment is therefore due to be granted.

        2.      **Did Mr. Mott suffer an adverse employment action because of his disability?**

Furthermore, even if Mr. Mott had adduced sufficient evidence to enable a reasonable jury to find that he suffered from a disability within the meaning of the ADA, the court finds that Mr. Mott has failed to establish the third element of his *prima facie* case–that he suffered some adverse employment action because of his disability. While the court assumes, without so holding, that viewing the evidence in the light most favorable to the plaintiff, there may be a genuine issue of fact as to whether Mr. Mott was, in fact,

terminated,[6] *see EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989) (holding that an employee is "discharged" for purposes of a Title VII claim when the reasonable inferences that can be drawn from the language used by the employer supports the employee's belief that he was discharged), Mr. Mott has produced no evidence, either direct or indirect, to establish that his alleged discharge was undertaken *because of* a perceived disability. Under the circumstances of this case, where the proof that the defendants regarded Mr. Mott as disabled is so lacking, the temporal proximity between his return from his medical leave of absence and his alleged discharge does not establish the requisite causal connection. *Cf. Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739 (11th Cir. 1996). To establish the required causal link through circumstantial evidence, Mr. Mott must show that his former position was eventually filled by someone who was not disabled within the meaning of the ADA. *Cf. Hicks*, 509 U.S. at 508. However, the undisputed evidence establishes that CU Lending has not hired anyone to fill Mr. Mott's former position; in fact, Mr. G. M. Wolter now performs the duties formerly done by Mr. Mott. Thus, for this additional reason, Mr. Mott has failed to establish a *prima facie* case of discrimination, and summary judgment is due to be granted.

---

[6] Mr. Mott has not argued that he was constructively discharged. If he had, the court is of the opinion that there is insufficient evidence to support a finding that Mr. Mott's "working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1997) (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989)). Thus, Mr. Mott's sole argument with respect to whether he was subjected to an adverse employment action is that his belief that he was being discharged, when he was presented with the choice to accept the new compensation plan or find another job, was reasonable. *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989). Because the court finds that Mr. Mott has adduced no evidence to support a finding that any adverse employment action was undertaken *because of* a perceived disability, the court need not decide whether a reasonable jury could conclude that Mr. Mott was, in fact, discharged.

B. **Pretext.**

Even if Mr. Mott had presented evidence sufficient to establish a *prima facie* case of disability discrimination, the defendants have articulated a legitimate, non-discriminatory reason for discharging Mr. Mott: CU Leasing had become an unprofitable enterprise.[7] As the defendants' burden in producing a legitimate, non-discriminatory reason for their decision to terminate Mr. Mott is an exceedingly light one, the court is satisfied that the defendants have met that burden. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Therefore, Mr. Mott must come forward with evidence from which a reasonable jury could conclude that the defendants' proffered reason is mere pretext for discrimination. *Chapman*, 229 F.3d at 1024.

Mr. Mott appears to raise two arguments with respect to pretext: first, that the temporal proximity between his return from medical leave and his termination indicates that the defendants' proffered reason is pretext; and second, that the defendants' proffered reason is logically inconsistent with the undisputed evidence that Mr. Mott could have earned more money under the revised pay plan than he was earning at the time the plan was presented to him. With respect to Mr. Mott's first argument, as the court has explained *supra*, temporal proximity alone, under the circumstances of this case, cannot support a finding that the true reason Mr. Mott was terminated was because he was perceived as having a disability. Indeed, Mr. Mott was presented with the revised compensation plan on the day he returned to work from his medical leave because that was the first opportunity

---

[7] Because it believes there may be a triable issue of fact as to whether Mr. Mott was discharged, the court assumes, without so holding, that he was discharged for purposes of its discussion of pretext.

the defendants had to present the plan to Mr. Mott. The undisputed evidence shows that Mr. G. B. Wolter was concerned about the financial state of affairs at CU Leasing at the end of 2000, and it became clear that something needed to change once the financial data from the first quarter of 2001 became available. It was at that time that he asked Mr. Shaffield to prepare the revised pay plan for Mr. Mott, who was the only individual, other than Mr. G. M. Wolter, who did any work for CU Leasing. The fact that Mr. Mott happened to be out on medical leave at that time is a mere fortuity, and cannot support a finding that the otherwise reasonable, legitimate decision to cut costs in a failing business was really made to discriminate against Mr. Mott because his employers perceived him as having a disability.

Furthermore, the court does not agree that the defendants have articulated conflicting positions with respect to the compensation plan. As the defendants point out, "[t]here is nothing contradictory about [the] defendants presenting [Mr.] Mott with a pay plan and changing his compensation from strict salary to salary plus commission to cut financial losses and also maintaining at the same time that [Mr.] Mott could have earned more money under the revised compensation plan." [Doc. # 40, at 6.] Whereas prior to his termination, Mr. Mott was earning $38,664.96 a year, under the new compensation plan, his employer would pay him only $12,000.00 a year, thus saving the company $26,664.96 a year. However, if Mr. Mott had met the sales projections outlined in the revised plan, he would have had the ability to earn significantly more than $38,664.96 a year based on the commissions he would be receiving. Presumably, the fact that his earnings were increased would have improved his employer's financial circumstances. Thus, not only does Mr. Mott's argument not support a finding of pretext, it is simply wrong. Therefore, summary

13

judgment is due to be granted because even if Mr. Mott had established his *prima facie* case of discrimination, he is unable to establish that the defendants' legitimate, non-discriminatory reason for terminating him was mere pretext for discrimination.

## V. Conclusion.

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 4th of December, 2002.

_____
Edwin Nelson
United States District Judge

14